69 So.2d 331 (1953)
LOEFFLER et al.
v.
ROE et al.
Supreme Court of Florida. Division B.
December 11, 1953.
Rehearing Denied January 27, 1954.
*332 Ralph Richards, Clearwater, for appellants.
Casler, Douglas & McManus, Clearwater, for appellees.
DREW, Justice.
On October 9, 1952, appellants, O.C. Loeffler and Miralda Loeffler, his wife, hereafter referred to as the vendors, entered into a written agreement with appellees, hereafter referred to as the purchasers, for the sale of a tourist court in the City of Clearwater. The purchase price of the property was $75,000, of which $5,000 was paid when the contract was signed. The balance of the purchase price was to be paid as provided in the contract.
The contract contained a provision whereby the vendors agreed to convey said lands "by good and sufficient warranty deed containing full covenants of warranty of a fee simple marketable title" to the realty "free and clear of all encumbrances whatever." The contract further provided:
"The Vendor agrees to deliver to the Purchaser, as soon as the same can be obtained with reasonable diligence, an abstract of title to said real estate, or a written commitment issued by some recognized title insurance company doing business in the State of Florida binding that company to insure the title in the Purchaser upon the consummation of this agreement. If an abstract is furnished, such abstract shall bring the title down to the date of this contract, or later, and shall show a good record, unencumbered fee simple title in the Vendor except as herein otherwise provided. The Purchaser shall have fifteen days after the delivery of said abstract for the examination thereof, and within said period shall notify the Vendor in writing of any objections to said title. If this notification is not given within the time stated, then said title shall be conclusively deemed to be acceptable to the Purchaser. In the event that the title of the Vendor is not good and marketable, the Vendor shall have a reasonable time thereafter to perfect the title; and if the defects are not cured within a reasonable time, then the Purchaser may demand a return of all earnest moneys paid by him and cancel this contract, or waive the defects and accept the property without deduction on account of said defects.
* * * * * *
"This sale shall be closed as soon as title insurance commitment has been issued, or as soon as the abstract of title has been examined by the Purchaser and Vendor's title found to be as herein represented; and in any event the sale shall be closed not later than November 1st, 1952. The time of payment shall be of the essence hereof, and upon default in payment of any part of the purchase money as and when the same becomes due, the Vendor may rescind this contract, retaining the cash consideration paid therefor, and thereupon this contract shall become null and void.
"The purchaser shall be permitted to go into possession of the property covered by this contract on date of closing.
* * * * * *
"In the event that it becomes necessary for the Vendor to enforce this contract by foreclosure proceedings, then all costs of such proceedings, including a reasonable attorney's fee, shall be paid by the Purchaser."
Vendors promptly delivered an abstract of title to the purchasers, who, in the interval had employed a surveyor and had the lands surveyed. On October 24th the purchasers advised the vendors and their attorney by letter that they had elected to cancel the contract because the survey of the premises revealed that the buildings on the land described in the contract extended beyond the lot lines. On October 30th the *333 vendors, through their attorneys, wrote the purchasers and their attorneys as follows:
 "Mr. E.B. Casler, Jr.,
 "Clearwater, Florida
 "Mr. Sidney R. Roe
 "Janesville, Wisconsin
"Dear Sirs: 
"I am writing you in behalf of my clients, Mr. and Mrs. O.C. Loeffler. Under date of October 9th, 1952, Mr. and Mrs. Loeffler signed a contract to sell to Sidney R. Roe and Hazel M. Roe property described as Lots 28, 29, 30 and 31, Block `B', First Addition to Clearwater Beach Park. The consideration for said property was $75,000.00, of which $5,000.00 was paid in cash as a binder at the time of the signing of the contract.
"The contract provided that an abstract of title should be furnished to the purchasers, which was done. The contract had the usual provision that the purchasers should notify the vendors in writing of any objections to the title, and that if the purchasers had any objections to the title then `the vendors shall have a reasonable time thereafter to perfect the title.'
"Pursuant to the terms of this contract, Mr. E.B. Casler Jr. wrote me a letter under date of October 24th, 1952. In that letter he stated that the purchasers, Mr. & Mrs. Roe, desired to cancel the contract because it appeared from a survey made for them that `the buildings located on the lands extend beyond the limits of the land'.
"The buildings on this property were erected by Mr. Horace Percival. The buildings were financed by a first mortgage loan from the First Federal Savings & Loan Association of St. Petersburg. In all cases of this kind, the Savings & Loan Association requires a survey showing that the buildings are properly located within the lot lines. Mr. Percival secured such a survey which was prepared by Mr. F.G. Young, a registered surveyor and engineer having his offices in St. Petersburg. I enclose a photostatic copy of this survey herewith, and you will see that it shows the buildings to be located entirely within the lot lines.
"I have secured a copy of the survey that was apparently made by Mr. Butler for Mr. and Mrs. Roe. This survey seems to indicate that one corner of the northerly building encroaches on Mandalay Road a distance of 1.45 feet. It also apparently shows that one corner of the northerly building encroaches on the alley a distance of 1.71 feet, and that one corner of the southerly building encroaches on the alley a distance of eight-tenths of one foot. Mr. Butler's office advises me that these encroachments consist merely of overhangs on the part of the eaves of the buildings, and that there is no encroachment as far as the walls of the buildings are concerned.
"It is not surprising that there should be some slight differences between the surveys made by Mr. Young and by Mr. Butler. It is a well known fact to every lawyer practicing in this area that surveys on Clearwater Beach Island are not as accurate as they are on the mainland. I presume this is due to the fact that it is difficult to keep the survey lines entirely accurate in crossing the large expanse of water between the mainland and the Island, plus the fact that there are no definite reference points on the Island that are unquestionably established and conceded to be correct. For these reasons, and perhaps others, slight discrepancies frequently appear in different surveys made on Island properties. If titles were rejected every time a slight discrepancy of this kind developed in connection with a lot on the Island, it would be very difficult indeed to transfer property over there. I believe I am correct in saying that these slight discrepancies are usually disregarded, and as we all know lots on the beach change *334 hands very readily and titles are generally accepted.
"In the instant case, it may be that Mr. Young's survey showed merely the walls of the buildings and did not attempt to show the overhangs. Since the encroachments as shown by Mr. Butler's survey occur only at the corners of the buildings, and are very slight encroachments, it is obvious that these encroachments could readily be eliminated by merely cutting off that small portion of the eaves that overhang. If it is your desire that this be done, I will advise Mr. Loeffler to do so at his expense. However, it seems to me that this is entirely unnecessary, either from Mr. Loeffler's standpoint or from Mr. Roe's standpoint.
"I believe you would be perfectly safe in relying on Mr. Young's survey and accepting the property as it is. Encroachment by the eaves, if any actually exists, is so slight that I do not think it can be considered as a legitimate objection to the title. However, there is another procedure that can be followed to eliminate the difficulty altogether if you so desire. This procedure would consist in having the City of Clearwater vacate any part of the street and any part of the alley on which an encroachment may actually exist.
"The procedure above suggested is quite familiar to Mr. Casler, as well as to myself. This situation arose many times during the years I served as City Attorney, and I am sure it also arose many times while Mr. Casler was Mayor and Commissioner of this city. In such cases the City has always readily cooperated, and I am sure the City will do so in this case. I represented the J.C. Penny Company when that company erected a new building at an approximate cost of a quarter of million dollars two or three years ago. There was some question in that case as to an encroachment of several feet on Cleveland Street, and at my request the City Commission very readily passed a resolution establishing the north line of Cleveland Street in such a manner that there would be no encroachment on the part of any building. In the instant case the encroachment on the street and alley, if any, is so negligible that I am sure the City would not raise the slightest question about passing a resolution to vacate any part of the street and alley on which an encroachment may exist. This is partidularly true in view of the fact that the alley at the rear of the buildings is merely a theoretical alley which has never actually been opened and probably never will be.
"In view of the foregoing, please be advised that Mr. and Mrs. Loeffler still consider the sales contract as being in full force and effect, and legally binding on all parties thereto. If you desire to have Mr. Loeffler remove that small part of the eaves that may possibly overhang the street and alley, please advise me to that effect and I will immediately advise him to do so. If you desire a resolution from the City Commission as above suggested, please advise me to that effect and I will immediately proceed to secure such a resolution. In other words, I stand ready and willing to take any steps in behalf of Mr. and Mrs. Loeffler to satisfy Mr. and Mrs. Roe as to the title, even though I consider the title in its present condition to be entirely good and merchantable.
 "Very truly yours,
 "Ralph Richards."
On November 17th a further communication was directed to the purchasers and their attorney by the vendors. This letter is as follows:
 "Mr. E.B. Casler Jr.
 "Attorney at Law
 "Clearwater, Florida
 "Mr. Sidney R. Roe
 "626 North Garfield Avenue
 "Janesville, Wisconsin

*335 "Gentlemen:
"I am writing you with further reference to the contract entered into as of October 9th by which my clients O.C. Loeffler et ux agreed to sell and Mr. and Mrs. Sidney R. Roe agreed to buy certain property at Clearwater Beach, commonly known as the Kathay Apartments.
"Under date of October 24th Mr. E.B. Casler, Jr. wrote a letter addressed to Mr. and Mrs. Loeffler and me stating that the title was unacceptable because of a small encroachment shown by a survey prepared by Mr. Leo Butler. Under date of October 30th I wrote a letter addressed to each of you gentlemen with which I sent you a photostatic copy of a survey made by Mr. G.F. Young which shows no encroachments. In that letter I pointed out that even if Mr. Butler's survey is correct, the encroachments indicated by his survey are very slight and consist merely of an overhang of a few inches on the corner of the eaves. I also offered, if you so desired, to take the matter up with the authorities of the City of Clearwater and ask the City to vacate the few inches of the street and alley affected, by this encroachment, or take some similar action to make certain that Mr. Roe would never have any difficulty over this slight encroachment, if in fact the encroachment actually exists.
"The contract provides that if the purchasers find any objections to the title, the sellers shall have a reasonable time to perfect the title. I had hoped that my letter of October 30th, written in behalf of the sellers, would cover the situation to your satisfaction so that the purchasers could go ahead and complete the transaction. And it is my personal belief that even if any slight encroachment actually exists, the steps that the sellers agreed to take as outlined in my letter of October 30th would constitute a compliance on their part with the provision of the contract giving them a reasonable time to perfect the title. However, I am sorry to learn that the terms of my letter of October 30th written in behalf of the sellers were apparently not satisfactory to you, as I am advised that Mr. Casler has now filed suit to rescind the contract and require a return of the $5,000.00 earnest money.
"Mr. and Mrs. Loeffler are willing and anxious to comply fully with their obligations under this contract. It is my opinion, first, that their title is good and merchantable without any action of their part. It is my opinion, second, that even if any slight defect may be considered to exist in the title, such defect can be considered as eliminated by the steps that Mr. and Mrs. Loeffler agreed to take as outlined in my letter of October 30th. However, by way of doing far more than they are legally obligated to do in order to satisfy Mr. and Mrs. Roe as purchasers of the property, I hereby offer to take one further step that should, in my opinion, clear up any doubt that you or either one of you may still have in your minds regarding the title to this property.
"Shortly after this question about the title first arose, I took the matter up with the Title & Trust Company of Florida to see whether or not they would consider the title insurable in its present state. I furnished them with copies of the surveys made by Mr. Young and by Mr. Butler so that they would be fully advised as to the slight encroachments that are shown by Mr. Butler's survey but not shown by Mr. Young's survey. I asked the company to advise me as to what guarantee they would be willing to give Mr. and Mrs. Roe against any loss on account of these supposed encroachment . I now have a communication from the company in which they agree to write a fee simple title policy for the sum of $75,000.00 in favor of Mr. and Mrs. Roe, and to insert therein the following provision:

*336 "`Survey furnished shows that the eaves of the apartment building encroach into the alleyway in the rear and onto the street in front. However, this company guarantees to save the assured harmless from all loss or damage arising by virtue of such encroachment for as long as the buildings remain in their present location.'
"It will cost Mr. and Mrs. Loeffler a substantial fee of something like four or five hundred dollars to buy a title policy. It is my personal opinion that this is an unwarranted expense and that the title should be considered good without such policy. However, as I said above Mr. and Mrs. Loeffler are willing and anxious to do everything within reason to give Mr. and Mrs. Roe absolute assurance that they are getting a good title to this property and that they will never suffer any loss because of these supposed encroachments as shown by Mr. Butler's survey. In behalf of Mr. and Mrs. Loeffler, I therefore now offer to furnish Mr. and Mrs. Roe with a fee simple title policy in the amount of $75,000.00 written by the Title & Trust Company of Florida and containing the specific provision above quoted along with all of the other usual provisions of a title insurance policy.
"It seems to me that this should settle all question about the title that Mr. and Mrs. Loeffler now hold and which they are willing to convey to Mr. and Mrs. Roe. As Mr. Casler well knows, the Title & Trust Company of Florida is the most substantial and reliable and best known Florida title insurance company, and its policies are accepted without question in every part of the state. I am ready to secure title commitment promptly and deliver it to you upon receipt of word from you that you will accept the policy and proceed to close the sale.
 "Very truly yours,
 "Ralph Richards."
Purchasers promptly rejected the proposition contained in the November 17th letter, insisting that they had contracted to purchase an unencumbered title from the vendors and that they would accept nothing short of that.
On November 19th the purchasers instituted this suit to cancel the contract and to secure the return of the $5,000 initial payment on the contract and to have the provision of the contract relating to attorneys' fees construed to apply as well to the purchasers as to the vendors and for an award of reasonable fees for the services of their solicitor in the action. From a decree in favor of the purchasers  except as to attorneys' fees  this appeal has been prosecuted.
The various contentions of the parties are readily ascertainable from an examination of the two letters which we have heretofore quoted. With the exception of the question relating to attorneys' fees on which no appeal was taken, the nub of the law suit and the real question presented here and to the lower court for determination was and is whether, under the terms of the contract the encroachment of the building or parts thereof on the public ways renders the title unmarketable.
Except insofar as it may affect the general equities of the cause we attach no significance to the offer of the vendors to furnish the title insurance. They (the vendors) elected to proceed under the provisions of the contract whereby they agreed to furnish an abstract of title. Under the language employed in the contract both they and the purchasers were then bound by its provisions with respect to an abstract of title rather than title insurance. In other words, having elected to proceed to close the sale on an abstract of title the contract must be construed in the same manner as if title insurance had never been mentioned or referred to therein.
The lower court personally heard the evidence in the cause and personally inspected the buildings. He found from the evidence that the buildings did not encroach on the adjoining private lands. As to the encroachments on the pubic ways at the front and rear of the property he found:

*337 "* * * However, the buildings are constructed with rather wide roofs that project out from the buildings themselves for some distance, and the evidence shows that one corner of the roof of one building overhangs the sidewalk on Mandalay Boulevard for a distance of something more than one foot. The evidence also shows that one corner of one building overhangs a public alley in the rear of the building for a distance of something more than one foot and that one corner of the other building overhangs the alley for a distance of something less than one foot. The evidence also shows that one corner of the concrete floor of an open porch extends into the alley for a distance of some four inches, and that an ornamental iron support of the porch is very close to the line and perhaps extends over the line a very short distance * * *"
The evidence of various city officials was introduced by both parties concerning similar encroachments of buildings over the public ways in Clearwater and the attitude of the city officials concerning the same. There was no substantial conflict in this evidence and from it the lower court found:
"* * * The defendants have offered evidence to show that similar encroachments are permitted by the long-standing custom of the City of Clearwater. In fact, officials of the City of Clearwater testified that a large proportion of business buildings in the City of Clearwater have similar overhangs or encroachments on public property, and that the City offers no objection * * *"
From these facts the Court concluded:
"* * * Nevertheless, it is the opinion of the Court that the purchaser of property is not required to take title to land unless all of the buildings are on or above the land, title to which is being proffered, and that any projection of a building, either through corners, marquees, roof or slab foundation for support into or over lands which are not vested in the vendor, prevents a title from being marketable. Even though customs of the City in which the property is located permit encroachments and overhangs, it is possible for the City to change these customs at any time."
The courts have never been able to establish or agree upon any fixed rule in determining whether encroachments are of such a character as to justify a purchaser in refusing to complete a contract of purchase. This is so because of different facts which necessarily exist in every case. It is so because the situation presented where the encroachment was over a public way is different from that where it is over private property. Still another would be present where the encroachment was on the property being sold. On the subject of encroachment generally it is said in 55 Am. Jur. 706-707, par. 252:
"In determining whether encroachments are of such a character as to justify the vendee in refusing to take title, the court will weigh the object of and inducement to the vendee in entering into the contract, and, looking into the merits and justice of each particular case, relieve the vendee from the contract to purchase if the character of the transaction, the circumstances, and the equities require. There can, of necessity, be no fixed rule for determining the extent of an encroachment necessary to bring any particular case outside the rule `de minimis non curat lex,' since the facts of each case are invariably different, and the test to be applied is whether the encroachment is substantial enough seriously to interfere with the use and enjoyment of the premises. Hence, each case must be determined upon its own merits.
"The question as to the extent of the encroachment, or the quantum of damage to the vendee therefrom, will not be considered by the court, where a vendor has expressly stipulated against encroachments affecting the marketable character of his title." (Emphasis added).
*338 The legal maxim "de minimis non curat lex," simply means that the law does not care for small things. If the encroachments in this case are "small things" within the meaning of that maxim, then it might justly be said that the rejection of the title because of the encroachments was an excuse and not a reason. Threaded throughout the decisions on the subject and in the treatises on the question, is some variation of the above maxim. Some courts have held that an encroachment renders the title unmarketable if it is of "any consequence" or is of "a substantial nature."
An encroachment may be of consequence or of a substantial nature if it is on private property and not if it is on or over public property. So much depends on the policy, laws and customs of the public body having jurisdiction of the public places that the courts have very tersely said that each case must be decided on the facts present in that case.
As to encroachments on public ways we quote from 55 Am.Jur. 708-709, par. 255:
"Whether or not an encroachment on a public street of a building situated upon land sold by executory contract affects the marketable quality of the title depends largely upon the character and extent of the encroachment and the laws of the municipality wherein the property lies. A vendor does not have a marketable title if his building encroaches upon the public streets to such an extent as to threaten the vendee with a substantial loss in the fee or in the rental value of the premises, or with a burdensome expense in altering the building to meet the requirements of the law. The doctrine of `de minimis non curat lex,' relating to a comparatively trifling cost to remove encroachments has no application to the removal of a brick facing off the front of a substantial building. The projection from a building into the street of windows and porticos, the removal of which the municipality may require at any time, renders the title unmarketable, although they were constructed under a revocable permission given by a municipal ordinance, if their removal would entail a burdensome expense and cause a substantial loss in the fee and rental value of the premises. However, encroachments in a public street may be of so slight or trivial a character, or the character of the portion of the building which encroaches may be such, as to render the damage so easily remunerable, if necessary, that the title to the property will not be affected by it, especially where it does not appear that such an encroachment is violative of the policy of the municipality. Neither can the vendee object to the existence of an alleged encroachment when it has been authorized by public authority. Moreover, if the right to maintain an encroachment in a public street has been acquired by lapse of time the encroachment does not affect the title.

"If a survey is necessary to determine whether projections encroach on the street, the fact that they are plainly visible does not preclude the purchaser from objecting to the title on account of the encroachment." (Emphasis added).
See also the extensive Annotation in Note (1928) 57 A.L.R. 1253, 1451.
In the case of Scheinman v. Bloch, 97 N.J.L. 404, 117 A. 389, 390, affirmed 98 N.J.L. 571, 119 A. 926, the New Jersey Court held:
"* * * in the absence of some special provision in the contract of sale, the front stoop or porch of a dwelling house projecting over part of the sidewalk by virtue of lawful municipal authority, and not extending beyond the limits defined by such authority, is not to be deemed as amounting to a defect in or incumbrance on the title such as will justify a purchaser in refusing to carry out his contract of purchase. * * *"
In the case of Waterman v. Taub, 127 A. 676, 3 N.J. Misc. 216, affirmed 102 N.J.L. 472, 131 A. 924, the New Jersey Court held *339 that a wall along a public sidewalk deviating one-half inch from a direct course and a special encroachment of one to nine inches was not such a substantial encroachment as to authorize a cancellation of a contract to purchase. Again, in Harrington Co. v. Kadrey, 105 N.J. Eq. 389, 148 A. 3, the New Jersey Court made the same holding as to overhanging cornices, decorative pilasters, etc., observing, in reaching the conclusion, that they were all susceptible of removal at slight expense.
The New York Court in Empire Realty Corp. v. Sayre, 107 App.Div. 415, 95 N.Y.S. 371, 373, made the following pertinent observations in disposing of a somewhat similar case in favor of the vendor:
"* * * the only party that has the legal authority to question the right of the owner to maintain the building as it now stands is the city of New York.
"As to the city it may be assumed, although there is no evidence upon the subject, that in contemplation of the erection of the building the then owner observed the preliminary requirements of filing with the proper city department, the department of buildings, the necessary plans, and that the building was erected with the consent of the city after it had approved of these plans. * * * So far as the record shows no complaint has been made by the municipality concerning the encroachment, and no steps have been taken looking towards its removal, although the building has now been standing for about five years. Under these circumstances is not the possibility of hostile action by the city so remote that it should not be regarded as affecting the marketability of the title? Would this not be a case where the principle `de minimis non curat lex' would apply?"
There are many other cases along the same general line digested and discussed in the Annotation above referred to. Out of all these cases and the text authorities seem to come the principle that  so far as encroachments of buildings over public ways are concerned  the encroachment must be of such a substantial nature as to interfere with the normal use of the public way on or over which it encroaches and in addition thereto there must be a strong likelihood that the vendee would be subjected to litigation concerning it or be required to move it. In other words, the facts must reveal a case outside the rule "de minimis non curat lex." Do the facts in this case show that?
We do not put ourselves in the place of the eminent Chancellor who tried this case, nor do we propose to substitute our views of the facts for his. On the other hand, it is our plain duty to set aside his judgment if we conceive that the facts as determined by him fail to support the legal conclusion he reached in construing the facts. When the lower court found the encroachments did exist and then concluded that the purchaser "is not required to take title to land unless all the buildings are on or above the land" (being purchased) "and that any projection of a building * * * prevents a title from being marketable" he reached a conclusion contrary to the well established principles of law which we have discussed and he failed to give effect to the maxim to which we have referred several times.
We are fully aware that the public places of a municipality are held in trust by the authorities for the benefit of the people, but this principle does not prevent the vacation of the streets or portions thereof when done in the interest of the general welfare. The fact that, when abandoned, the title to the street or public place or portions thereof reverts to the adjacent owner is of no consequence if the power to vacate is present and if such power is lawfully exercised. Henry L. Doherty & Co., Inc., v. Joachim, 146 Fla. 50, 200 So. 238. Moreover, the evidence in this case establishes the fact that for many years the custom had been to permit such overhangs over the streets. The lower court so found when it held that "Even though customs of the city *340 in which the property is located permit encroachments and overhangs," etc. It must be assumed from such finding that the general welfare of the city is being served by allowing such inconsequential encroachments to continue to exist. The fact that the subject building was built only recently, evidently pursuant to building permits therefor and under appropriate supervision, places some degree of responsibility on the city officials  especially where, as here, the extent of the encroachment is of an inconsequential nature and not of a character to interfere in any manner whatever with the normal use of the sidewalk or the alley. We make no pretense of prejudging the matter, but it is a fundamental principle of equity that courts will not require the performance of an act where the harm to the person coerced is wholly disproportionate to the benefit to the other party. Johnson v. Killian, 157 Fla. 754, 27 So.2d 345. It should also be remembered that estoppel can be pleaded against the sovereign as well as against individuals. Only recently we held that where the State levied taxes on public lands, sold the certificates thereon and conveyed, through its agents, title thereto, the State became estopped to deny the validity of the tax and a deed thereafter executed pursuant to the tax. Trustees of Internal Improvement Fund v. Bass, Fla., 67 So.2d 433.
A careful study of the testimony, exhibits and pleadings in the lower court convinces us that the encroachments in this case, considered in the light of the plain and long standing policy of the city with reference to similar encroachments, are not of such magnitude as to render the title unmarketable. We hold them to be inconsequential and, under the facts before us, within the rule "de minimis non curat lex."
The decree of the lower court is reversed with directions that the lower court proceed further in a manner not inconsistent with the views herein expressed.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., concur.