Chas. T. Main, Inc. *vs.* Massachusetts Turnpike Authority.

Suffolk. January 7, 1964. — March 4, 1964.

Present: Wilkins, C.J., Cutter, Kirk, Spiegel, & Reardon, JJ.

*Contract,* Construction, With engineer. *Interest.*

Under a carefully prepared, formal written contract between an engineering firm and a turnpike authority for "complete and comprehensive engineering services" in connection with the construction of a section of the authority's turnpike, containing provisions, among others, that the

Chas. T. Main, Inc. v. Massachusetts Turnpike Authority.

"construction phase" services were to be "complete[d] . . . at such times as the progress of construction . . . requires" and that the firm should not make any "charges or claim . . . for any delays . . . from any cause whatsoever," and containing no mention of any calendar date for termination of the services, the firm was not entitled to compensation in addition to the fee provided for in the contract where it appeared that, through reasonable delay, not caused by the authority, in completion of the construction work far beyond the time for its completion contemplated by both parties when the contract was made, but not guaranteed or represented by the authority, the originally contemplated period for performance of the firm's services was prolonged substantially. [162–165]

An engineering firm, which had performed the engineering services in connection with construction of a section of a turnpike under a contract with a turnpike authority basing the firm's fee on the cost of the construction work and payments by the authority for relocation of public utility facilities and providing for the authority's retaining a part of the fee until completion and acceptance of the construction work and "final determination" of the cost, was entitled in the circumstances, without demand, to interest on the retainage from a date when the firm and the authority had become "in agreement" as to the cost of construction and the cost of relocation of public utility facilities had been determined, although one of the utilities had not then submitted its bill in a small amount and litigation between the authority and one of the construction contractors delayed formal acceptance of a part of the construction work until a later date. [167–169]

CONTRACT. Writ in the Superior Court dated February 3, 1959.

The action was heard by *Cahill*, J.

*Francis V. Matera* (*Walter J. Hurley & Timothy J. Driscoll* with him) for the defendant.

*Hervey W. King* (*Frank B. Frederick* with him) for the plaintiff.

CUTTER, J. This is an action at law[1] brought by an engineering corporation (Main) to recover fees for services rendered in designing and supervising construction of a part of the Massachusetts turnpike. The case was referred to an auditor. A judge of the Superior Court heard the case on the auditor's report, a statement of counsel about what an engineer would testify concerning one item, and

---

[1] Companion cases are *Fay, Spofford & Thorndike, Inc.* v. *Massachusetts Turnpike Authority, post,* 169 and *Clarkeson Engineering Co., Inc.* v. *Massachusetts Turnpike Authority, post,* 173. All three cases present substantially the same principal questions, but can be more conveniently discussed in separate opinions.

certain minor documentary evidence. The judge found for Main on certain counts and made additional findings. The case is before us upon a consolidated outline bill of exceptions (see Rule 22 of the Rules for the Regulation of Practice before the Full Court [1952], added March 5, 1963, 345 Mass. 795) in which the authority presents its exceptions to a number of rulings and to the judge's findings. Main also presents exceptions to several rulings.

After the enactment of St. 1952, c. 354, the authority prepared to construct the turnpike. It employed one firm as general engineering consultant (the general consultant). It also engaged six engineering firms, among them Main, and assigned to each a specific section of road for study. Main thereupon made a ten-month study of a section of the proposed road. Main was paid for this study, which was incorporated in a consolidated report for the whole project forwarded to the authority by the general consultant. In this report and some of the accompanying material, it was estimated that, if funds should become available by June 15, 1954, the turnpike could be opened to traffic on November 15, 1956. Funds did become available prior to June 15, 1954. On June 12, 1954, Main learned that it was to receive the engineering contract for section H of the turnpike, a portion of the section of which it had made a study.

On June 30, 1954, Main executed a written contract under which it agreed as a section engineer to perform "complete and comprehensive engineering services" on section H. The work was to be divided into a "design phase" and a "construction phase." In general, the design phase included making all plans and investigation preliminary to letting construction contracts. The construction phase included all aspects of supervision and inspection of construction.[2]

---

[2] Article 3 (e) of the contract ·defined the "construction phase" as including "the supervision and inspection of construction, the furnishing of . . . control surveys . . . the conducting of field tests and approval of materials . . . the preparation of alteration and extra work orders, the preparation of partial . . . and final estimates for payment to contractors, the completion of as-built plans, and other related services. This term is used in contradistinction to 'design phase' and has a common meaning among persons in the profession of engineering . . .."

Chas. T. Main, Inc. *v.* Massachusetts Turnpike Authority.

Main agreed (art. 4) to complete most design-phase work by December 31, 1954, and to "complete the balance of the design-phase services . . . and all construction-phase services in such manner *and at such times as the progress of construction and other work requires,* and so that no delays will be caused by" Main (emphasis supplied). Main was to receive a fee (art. 5) for its design-phase services "equal to 3.0% of the cost of construction" and (art. 6) "a fee for the construction-phase services equal to 3.5% of the *sum* of the cost of construction and [an] amount equal to 75% of the total of all payments . . . for the relocation of public-utility facilities" (emphasis supplied). Article 7[3] of the contract contained a provision for additional fees for certain extra work.

Article 8 provided for monthly partial payments to Main during both the design phase and the construction phase. Article 9 covered the matter of the final payment.[4]

Article 20, governing delays and damages, is set out in part in the margin.[5] There is no mention in the contract or in the section engineer's specifications mentioned below of any calendar date for the termination of Main's services.

The contract (art. 2) required all work to be done in ac-

---

[3] Article 7 reads in part: "If . . . [Main] is of the opinion that any work . . . is beyond the scope of this [a]greement and constitutes extra work . . . [Main] shall promptly notify the [a]uthority . . . . In the event that the [a]uthority determines that such work does constitute extra work, it shall provide extra compensations [*sic*] to . . . [Main] upon a fair and equitable basis, mutually agreeable to both parties. . . ." Main makes no claim under this provision, which is significant only because it is of assistance in interpreting other provisions.

[4] In general art. 8 provided for partial payments equal to "90% of the amount" of the design phase fee or the construction phase fee, and gave the authority, at its option, power to retain smaller amounts than specified or to cause Main "to be paid from time to time such portion of the retainage as it [the authority] deems prudent." Article 9 provided that "[u]pon the completion and acceptance by the [a]uthority of all construction work required by all of the construction contracts and the final determination of the cost of construction, the [a]uthority shall pay . . . [Main] the unpaid balance of the design-phase and construction-phase fees. All payments (partial and final) . . . are subject to the approval of the" general consultant.

[5] Article 20 reads, in part, "[Main] agrees that no charges or claim for damage shall be made by . . . [it] for any delays or hindrances *from any cause whatsoever* during the progress of *any portion of the services* specified in this agreement. Such delays or hindrances, if any, shall be compensated for by an extension of time for such reasonable periods as the [a]uthority may decide" (emphasis supplied).

Chas. T. Main, Inc. *v.* Massachusetts Turnpike Authority.

cordance with the standard practices of the authority, with the "Standard Specifications of the Authority," and with the "Specifications for Section Engineer's Services" which were attached to the contract. Certain provisions of these specifications are summarized in the margin.[6] The standard specifications of the authority constituted a draft of basic construction contract for use in the construction phase and contained provisions (arts. 72 and 73) covering the extension of time for completion of construction and concerning failure of a construction contractor to complete work on time. Accordingly, Main had cause to recognize in advance that circumstances might arise in which the time for completion would be extended. Article 73 provided that liquidated damages would be waived "if the [p]roject in its entirety, or if any portion of the work for which a date of completion is stipulated, has been *substantially completed* within the prescribed time."[7] Articles 72 and 73, however, laid substantial emphasis on promptness in the performance of construction contracts.

---

[6] The specifications for section engineer's services (all emphasis supplied) provided that the authority "requires an *overall highway and bridge engineering service.* The scope of the service is *all-inclusive.*" Then follows a long list of items, including "negotiations with utility companies and railways . . . for . . . relocation . . . of their plants . . . the stake-out, control, supervision of construction, and the preparation of periodic and final estimates to project completion." A detailed description of a wide variety of engineering services is set out following the statement, "In no way limiting the *all-inclusive* character of the services desired the following items are . . . illustrative of *the scope and thoroughness* of the engineering services required." Later it is stated, "It is realized that all details of *a complete engineering service* cannot be spelled out in all particulars and that professional responsibility to the client must be relied upon, but it is believed that the above outlines the *general scope* of the services desired sufficiently to enable the [s]ection [e]ngineer to determine an equitable fee, organize to meet the fast schedule required, and be prepared to fulfill his professional obligations to the [a]uthority."

[7] "Substantial completion" is defined as "that measure of completion which will insure the following: 1. [t]hat there will be no delay in the opening of the [t]urnpike . . . for operation on the established date as a result of failure of the [c]ontractor to fully complete the [p]roject . . . within the prescribed times . . . and 2. [t]hat . . . work by other contractors can proceed on any completed . . . parts of the [p]roject on the dates set forth in the contracts for said other work, and 3. [t]hat the uncompleted work under the [c]ontract will be performed in a sequence . . . which will not delay . . . [or] increase the costs to, other contractors or the [a]uthority. The [a]uthority, acting upon recommendation from the [c]hief [e]ngineer, shall be the sole judge . . . whether the work under the [c]ontract has been *substantially completed* as described above."

Chas. T. Main, Inc. *v.* Massachusetts Turnpike Authority.

On section H, the authority let construction contracts to five contractors. Substantial completion of the work of each of them was required on a specified date in 1956. The contracts were in fact completed at much later dates.[8] Although both parties had anticipated "that the [t]urnpike would be opened to traffic on November 15, 1956 . . . the actual opening date was May 15, 1957."

Main is admittedly owed for its services in both phases a balance of $177,134.75, the amount of the unpaid "retainage" under art. 8 (fn. 4). The authority, however, disputes Main's claim for interest upon the amount of the retainages (the retainage interest claim) from May 6, 1958, the date on which Main contends (and the trial judge and the auditor found) that it should have been paid.

Main contends that the authority owes it further sums for additional construction phase services, not as an "extra" (fn. 3) under the contract, but because the delays in the completion of the various construction contracts caused Main "to perform its supervising services . . . for a much greater period than it had contracted for, thereby entailing additional . . . expenses. . . . The . . . [authority] maintains that . . . [Main] has performed no services that it was not legally obligated to perform" under its contract.

A. The Claim for Additional Compensation.

1. The auditor made the following principal findings concerning Main's claim for additional compensation: (a) "[A]t the time the contract was executed, both parties expected that the turnpike would be open for traffic on November 15, 1956." They "expected that . . . [Main's] engi-

[8] Data, relevant in considering each construction contract on section H of the turnpike, were as follows:

| (1) | (2) | | (3) | (4) | (5) | (6) |
|---|---|---|---|---|---|---|
| | Completion Date in Contract and Per Cent of Work | | Actual Date of Substamtial | Extensions | Actual Final Completion Date | |
| Contractor | then Done (all 1956) | % | Completion | granted (days) | (all 1957) | Date of Acceptance |
| DeFelice | May 31 | 65 | Mar. 26, 1957 | 430 | July 9 | Dec. 12, 1957 |
| Gilbane | June 1 | 63 | Nov. 15, 1956 | 205 | May 27 | Feb. 6, 1958 |
| Grandview | July 30 | 74 | Dec. 15, 1956 | 220 | June 3 | July 21, 1960 |
| Orlando | July 31 | 71 | May 1, 1957 | 307 | July 24 | Mar. 6, 1958 |
| Berlanti | Aug. 31 | 61 | Apr. 8, 1957 | 300 | July 9 | Mar. 20, 1958 |

neering services would be completed . . . about that date; and . . . it was with . . . [that] date . . . in mind that the completion dates were fixed in the various construction contracts." (b) When Main accepted the contract, "it contemplated that the construction contracts would be completed sufficiently in advance of November 15, 1956, so that its engineering services [then] would be concluded." (c) Main (see art. 4) "obligated itself to furnish the [specified] engineering services . . . until the last of the construction contracts on [s]ection H was completed," but did not bind "itself to furnish the services indefinitely, irrespective of any delays that might ensue, for the fee set forth in the contract." In the auditor's view "such a construction of the contract would be unreasonable." (d) "[N]either . . . [party] contributed to the delay . . . until May 15, 1957." (e) The authority "prior to the execution of the contract neither guaranteed nor represented to . . . [Main] that the road would be open for traffic on November 15, 1956. . . . [A]ny statement[s] . . . relating to the anticipated date . . . were *no more than representations* as to the . . . *expected* date for the opening" (emphasis supplied). (f) Main "performed all . . . services efficiently [and] expeditiously . . . and . . . both . . . [parties] at all times acted in good faith." (g) All "work which . . . is the subject matter of this claim is of the . . . character of the services contemplated" by the contract. (h) The "extensions of time granted . . . were . . . reasonable . . . and . . . [the authority] did not arbitrarily extend the [completion] time."[9] (i) Main "performed engineering

[9] Various extensions were granted to the construction contractors by the authority on Main's or the consultant's recommendations. In the *Fay, Spofford & Thorndike, Inc.* case, *post*, 169, in two instances that firm recommended that certain delays be charged to construction contractors. This difference from the *Main* case seems immaterial in view of the auditor's finding that all the extensions granted by the authority to "construction contractors were . . . reasonable" and that the authority "did not arbitrarily extend the time." A similar situation in some degree existed with respect to one of the construction contracts supervised by Clarkeson in the case brought by that firm, *post*, 173. The subsidiary facts found concerning that contract do not suggest that any improper or arbitrary extension of time was granted.

Among the causes for the various extensions granted (fn. 8, col. [4], *supra*) were increases in the amounts of the contracts, difficulties in obtaining releases of rights of way and railroad crossings, floods, cement shortages, and the necessity of redesigning bridges.

services for approximately eight months longer than was within the contemplation of the parties at the time they executed the contract.''

The auditor concluded that "unless as a matter of law a contrary construction is placed upon . . . the contract . . . [Main] was obligated to perform additional services for which no provision as to compensation was made in the contract,'' and "is entitled to recover the fair value of such additional services.''

The auditor disallowed any claim for additional compensation for any period prior to November 15, 1956, not only because he concluded "that all services performed . . . up to . . . that date were compensated by the agreed . . . fee,'' but also because they were "open to conjecture.'' He found (as did the judge later) damages for Main's additional services from November 15, 1956, to July 27, 1957, to be $124,571.52 with interest from the date of the writ (February 3, 1959), if recovery is not precluded as a matter of law.

2. The judge found, among other things, that the contract between Main and the authority "established the rate of compensation for a period of time which was to expire on or about Nov[ember] 15, 1956, but . . . did not provide for compensation over and above such rate for additional engineering services required when [the] [t]urnpike opening was extended beyond'' that date; that the authority "prolonged the opening until May 15, 1957, without the consent of . . . [Main] requiring additional engineering services not contemplated by the parties''; that "both parties contemplated . . . that the [t]urnpike was to be opened by Nov[ember] 15, 1956, and that all work necessary for such opening was to be completed by that date''; and that Main's "compensation . . . was based on such contemplation.''

3. In interpreting the contract, we necessarily take into account the auditor's findings that "the parties expected that the turnpike would be open for traffic on November 15, 1956,'' and that the delays caused Main to work for eight months "longer than was within the contemplation of the

parties when they executed the contract." These findings, however, must be read with the findings (a) that neither Main nor the authority "contributed to the delay"; (b) that the authority "neither guaranteed nor represented to" Main that the road would be opened by November 15, 1956; (c) that "all of the work" which Main performed was of the character contemplated by the contract (cf. *Oatley* v. *Duprey*, 312 Mass. 281, 285); and (d) that the extensions of time given to construction contractors were reasonable.

4. This is not an abbreviated agreement by correspondence, such as that considered in *Caputo* v. *Continental Constr. Corp.* 340 Mass. 15, 16–17. There we said that extrinsic evidence should have been admitted to show "[m]atters of importance which normally would be included in" such a contract, e.g. the time for performance. The omission of such matters indicated to us that the letters were not to constitute the entire agreement of the parties. See Corbin, Contracts, §§ 573, 590; Williston, Contracts (3d ed.) §§ 630, 633, 636. We have before us a carefully prepared written agreement, executed after extensive preliminary studies. It deals with a large project. With respect to such a contract, we should be slow to conclude that the parties omitted an essential term by inadvertence or left that term to implication.

5. Main was to perform "complete and comprehensive engineering services" and was to "complete . . . construction-phase services . . . at such times as the progress of construction . . . requires" (art. 4). The natural import of this inclusive language is substantiated by the broad coverage of the definition of work in the construction phase (see art. 3 [e], fn. 2, *supra*) and by the section engineer's specifications (fn. 6). The inclusion of a provision for "additional fees" (art. 7, fn. 3) indicates that this was the method by which Main was to be compensated for work not covered by the basic fees.

Perhaps most important is the provision governing "delays and damages" (art. 20, fn. 5). Main cannot recover compensation because of delays (at least for those not

caused by the authority or not unreasonable in length) if we read literally the statements in art. 20 that Main shall make "no charges . . . for any delays . . . from any cause whatsoever" and that "[s]uch delays . . . shall be compensated for by an extension of time." A provision like art. 20 seems less appropriate in an engineer's contract than in a construction contract. Nevertheless, the parties have included it and we must give it proper effect. We do not perceive any adequate basis for concluding that any other interpretation is more reasonable than the natural meaning of the language. See *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 502–503 ("The parties must have contemplated that there might be delay . . . and . . . agreed that . . . [Hosmer] should be given . . . additional time . . . but it was specifically provided that . . . [Hosmer] should have no claim for damages . . . . Such a provision negatives any pecuniary compensation for delay."); *Coleman Bros. Corp.* v. *Commonwealth,* 307 Mass. 205, 216; annotation, 10 A. L. R. 2d 801.

We do not find convincing Main's contention that the *Hosmer* case is distinguishable because the contract in that case contained a provision that the contractor would receive the specified compensation as "full compensation for everything . . . done . . . under this contract." The Main contract, read as a whole, to us has the same import. We also do not think that there is any basis in the language of art. 20 for saying that it applies only to the design phase of the work. If that had been the intention, it should have been so stated.

6. Since no delay caused by the authority or delay otherwise unreasonable took place, this contract by its terms imposed on Main an absolute obligation to provide comprehensive and complete services in return for the basic fees stated in the contract. See *Boyle* v. *Agawam Canal Co.* 22 Pick. 381, 384; *Beacon Tool & Mach. Co.* v. *National Prod. Mfg. Co.* 252 Mass. 88, 90. See also *Morse* v. *Boston,* 260 Mass. 255, 262–263. Cf. *McGovern* v. *Salem,* 214 Mass. 358, 362. The joint contemplation that the turnpike would be

opened on November 15, 1956, cannot on the findings be said to be more than an expectation. The possibility that it would not then be finished must have been as apparent to Main, an experienced engineering firm, as to the authority. Cf. *Benjamin Foster Co.* v. *Commonwealth,* 318 Mass. 190, 198–201. By signing a contract which in terms precluded charges for delays, and which did not make (as it could have made) explicit provision to cover additional compensation for reasonable delay, Main incurred the risk of the delays, not found to have been unreasonable, which did occur.[10]

The parties' contract stipulations for a complete performance and concerning delays leave no room, in our opinion, for implying as a term of the contract that the construction phase was to end on November 15, 1956. See *Kennedy* v. *B. A. Gardetto, Inc.* 306 Mass. 212, 216; *Zarum* v. *Brass Mill Materials Corp.* 334 Mass. 81, 85. Our conclusion is supported by the result in *Tippetts-Abbett-McCarthy-Stratton* v. *New York State Thruway Authy.* 18 App. Div. 2d (N. Y.) 402, modifying 38 Misc. 2d (N. Y. Ct. Cl.) 30 (as to the third cause of action) upon facts very similar to those in the present case, affd. 13 N. Y. 2d 1091. See *Benedict, Beckler & Associates,* 61–2 C. C. H. Bd. of Contract App. Dec. 16,831 (par. 3,250). Cf. *John Weil Plumbing Corp.* v. *State,* 267 App. Div. (N. Y.) 247, *S. C.* 294 N. Y. 6.

7. We hold that the judge improperly granted Main's requests for rulings, in substance that (no. 8) the facts found by the auditor would not support a conclusion that

---

[10] The omission of any provision defining the duration of the construction phase is consistent with the purpose of the contract and reasonably could have been intentional. See *Gaston* v. *Gordon,* 208 Mass. 265, 268–269; *Imbeschied* v. *Lerner,* 241 Mass. 199, 201; *Essex-Lincoln Garage, Inc.* v. *Boston,* 342 Mass. 719, 721. When construction ceases, loose ends may remain to be cleared up by an engineer. Some were here specified, e.g. the provision in art. 3 (e) for ''as-built plans'' (fn. 2). If, as we conclude, the parties intended that Main, for the construction-phase fee, was to supervise construction until it was completed, a statement of the duration of the construction phase would have been inappropriate. For a contract in which partial provision has been attempted to cover situations similar to that in the present case, see Parker and Adams, The A.I.A. Standard Contract Forms and the Law, 9, 37. See also the standard fixed fee architect-engineer contract used in military construction during World War II, arts. I–C, I–D, II–B, II–C, 10 Fed. Reg. 10700, 10701.

Main could not recover additional compensation; that (no. 10) nothing in the contract, as matter of law, bars Main from recovering additional compensation; and that (nos. 11 and 12) a finding for Main for additional compensation of $124,571.52 for services after November 15, 1956, was required. The exceptions to these rulings are sustained. Similarly, the substance of the authority's requests for rulings numbered 1, 8, 9, 10, 13, and 14 should have been given. The trial judge correctly gave the rulings (nos. 2, 3, 5, 6, 7, 15, 16, 18, 20) requested by the authority to which Main excepted. Main's exceptions to these rulings are overruled. Since, as matter of law, upon the facts found by the auditor and the trivial additional evidence before the trial judge no recovery of the claimed additional compensation would be warranted under the contract, judgment is to be entered for the authority upon each count involving any claim for such additional compensation.

### B.   The Retainage Interest Claim.

8.   Main contends that the authority owes it $177,134.75, with interest from May 6, 1958. This is the agreed amount of the balance of fees retained by the authority under arts. 8 and 9 of the contract (fn. 4, *supra*).

The progress in completing the several construction contracts has been outlined. See fn. 8, *supra*. The last construction contract (the Grandview contract) to be accepted by the authority was finally accepted on July 21, 1960, when the formal final determination of the cost of construction was made. This contract had been substantially completed on December 15, 1956, and all work had ended on June 3, 1957. The Grandview Construction Company refused to accept the amount approved for it by the authority and litigation ensued. The authority "concedes that there was no reason for the three-year lapse of time between the date of final completion and the date of final determination of the cost of construction, other than the . . . litigation."

Part of Main's fee for the construction phase (art. 6) was to be three and one-half per cent of an "amount equal to

75% of . . . payments . . . for the relocation of public-utility facilities." By "May 6, 1958, all utility work had been completed and all construction costs for it had been determined and paid" except that Central Vermont Railway had not sent a bill for $480.48, on which Main's fee would be $12.61. The authority contends that final determination of construction costs (under art. 9, fn. 4, *supra*) could not occur until the last of the public utility contracts was processed, accepted, and approved for payment by the authority. Because of the Grandview contract and this small Central Vermont item, the authority argued to the auditor and still takes the position "that the retainages were owed and not yet due and that . . . [Main] is not entitled to interest."

9. The auditor found: (a) Main was owed "$177,134.75 with interest . . . at . . . 6% from May 6, 1958." (b) Although formal acceptance of the Grandview contract was not "voted by the [authority's] [b]oard [c]ommissioners . . . until July 21, 1960, a final determination as between the parties to this litigation had been arrived at by March 20, 1958." (c) By then, Main and the authority "were in agreement as to the total cost of all of the construction contracts, other than those relating to utilities." (d) Main was not involved in the Grandview litigation. Its "right to receive the retainages . . . was not contingent upon the outcome of" that litigation, because the amount owed to Main "could not have been decreased below the construction cost arrived at by" Main and the authority.

The auditor concluded, in consideration of "the doctrine of 'de minimis,' " that "it would be both inequitable and unreasonable to hold that . . . [Main] is not entitled to recover interest" (where its total compensation amounted to more than $1,180,000) because of the Central Vermont bill on which Main's compensation would be $12.61 and the retainage $1.26. He also concluded (1) that "no fact or circumstance existed after May 6, 1958, that would justify the . . . [authority] in withholding the retainage after that date"; (2) that the authority's "purpose" in including

art. 9 "in its contract . . . appears . . . to have been for . . . protecting the . . . [authority] from making an overpayment to" Main; and (3) that, under art 9, Main was not required to make a demand.

10.  Central Vermont Railway's failure to submit its bill did not prevent Main from becoming entitled to final payment.  Although Main, under the specifications (fn. 6, *supra*) for section engineer's services, was to "[n]egotiate and conclude arrangements, subject to the approval of the [a]uthority, for . . . relocation . . . of utilities," these specifications also provided that the authority would "enter into any necessary final agreements with . . . railroads [and] utilities."  As the auditor indicated, it is "by no means clear" that Main had any responsibility for obtaining the bill for the agreed amount to be paid to the Central Vermont Railway.  Even if Main did have that responsibility, the absence of the small outstanding bill for an amount which had been determined was too inconsequential a matter to constitute a bar to Main's immediate recovery of the retainages.  See *Georges* v. *Pacific Tel. & Tel. Co.* 184 F. Supp. 571, 576 (D. Ore.); Williston, Contracts (3d ed.) §§ 805, 842; Corbin, Contracts, § 946; annotation, 44 A. L. R. 168.  Cf. *LeRoy Dyal Co. Inc.* v. *Allen,* 161 F. 2d 152, 156 (4th Cir.); *A. Belanger & Sons, Inc.* v. *United States,* 275 F. 2d 372, 376 (1st Cir.); *Loeffler* v. *Roe,* 69 So. 2d 331 (Fla.); annotation, 47 A. L. R. 2d 319, 331, 340–344, 351–354.

We regard as conclusive the auditor's finding (concerning the Grandview contract) that a "final determination as between the parties to this litigation" of the costs of construction "had been arrived at by March 20, 1958."  The outcome of the litigation could not decrease Main's compensation.  After March 20, 1958, nothing remained to be done by Main on the Grandview contract.

11.  Article 9 (fn. 4, *supra*) provided that Main was to receive the retained portion of its fee upon "the completion and acceptance . . . of all construction work . . . and the final determination of the cost of construction."  This

provision must be given a reasonable interpretation, in the light of the circumstances existing in 1958, and consistent with the provision's only reasonable purpose of preventing an overpayment to Main.

By May 6, 1958, there was no risk of overcompensating Main. All construction had been completed on July 24, 1957. The last acceptance of construction, except for the Grandview contract, had been made on March 20, 1958. By May 6, 1958, all utility work had been completed and costs for it had been determined. The turnpike had then been open to traffic for nearly twelve months. We hold that after that date the authority had no further justification for withholding the retainages. Main's work had been completed (see *LeBel* v. *McCoy,* 314 Mass. 206, 209), and it was entitled to payment.

Upon the auditor's findings, failure to pay by May 6, 1958, was a breach of contract which entitled Main thereafter to receive interest upon what was an unpaid, liquidated amount from at least this date when it should have been paid. There was no occasion for waiting for the formal vote of the authority's board in 1960. See *Donahue* v. *Partridge,* 160 Mass. 336, 339–340. See also *Winchell* v. *Plywood Corp.* 324 Mass. 171, 181; *C. & R. Constr. Co.* v. *Commonwealth,* 334 Mass. 232, 233; *E. Van Noorden Co.* v. *Hartford Roofing & Sheet Metal Co. Inc.* 336 Mass. 676, 678; Restatement: Contracts, § 337 (a); Corbin, Contracts, § 1046; Williston, Contracts (2d ed.) §§ 1410, 1413. The contract did not require demand. See *Vaughan* v. *Lemoine,* 330 Mass. 83, 86–87. Cf. *Vaughan* v. *Lemoine,* at p. 87; *Bright* v. *American Felt Co.* 343 Mass. 334, 336; *Davidson* v. *Robie,* 345 Mass. 333, 341–342; *Crown Indus. Inc.* v. *Boyertown Burial Casket Co.* 300 F. 2d 809, 810 (6th Cir.).

12. There was no error of law in the denial of the authority's motion to strike the portions of the auditor's report allowing interest on the retainages from May 6, 1958. Main's requests (nos. 1 to 7) for rulings concerning the retainage interest claim were properly granted. The rulings concerning this claim, requested by the authority, were

given. The authority's exceptions concerning this claim are overruled.

### CONCLUSION.

The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*