Filed 3/29/13  Textainer Equipment Management v. Pacific Interlink CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TEXTAINER EQUIPMENT MANAGEMENT LIMITED, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PACIFIC INTERLINK SDN BDH, <br><br> Defendant and Appellant. | A133155 <br><br> (San Francisco City & County Super. Ct. No. CGC10498933) |

Textainer Equipment Management Limited (Textainer) sued Pacific Interlink SDN BDH (Pacific) for unpaid rent on shipping containers Pacific lost while it had them on lease from Textainer.  Pacific asserts it does not owe rent because Textainer did not fulfill its contractual obligation to invoice Pacific for the lost containers' replacement value— payment of which would have stopped rent from accruing.  Textainer asserts it had no obligation to invoice Pacific, which could have paid the pre-set replacement value at any time to stop accrual of rent.  After inspecting the parties' lease agreement, the trial court ruled in favor of Textainer and awarded it rent and other damages.  We affirm.

**FACTUAL BACKGROUND**

On April 1, 2001, Pacific agreed, by written agreement, to lease intermodal shipping containers from Textainer.  The 2001 agreement sets forth the general terms governing the lease.  A later 2006 schedule, active at all times relevant to this appeal, specifies Pacific's minimum container commitment, the daily rental charges per

1

container, the containers' original replacement values, and a formula for calculating depreciated replacement value.

Paragraph 10 of the 2001 agreement is titled "RISK OF LOSS AND DAMAGE." It provides: "Lessee is liable for all loss . . . to the Containers subsequent to delivery and prior to return to Lessor, regardless of when such loss . . . may be discovered. Lessee is obligated to pay all Rental Charges on lost . . . Containers until the Off-hire Date of each Container." Further, "Lessee shall pay to Lessor the Replacement Value for such Container in accordance with the provisions of the Lease."

For a lost container, paragraph 1 of the agreement defines "Off-hire Date" as "the date upon which Lessee has paid the Replacement Value of the Container to Lessor."

Paragraph 6 governs "BILLING AND PAYMENT." Subparagraph (c) provides: "In the event that Lessee shall become responsible under the Lease for the Replacement Value of Containers, Lessor will charge Lessee, and Lessee will pay Lessor for the Replacement Value of such Containers." The general terms of paragraph 6 provide: "PAYMENT OF ALL CHARGES MUST BE MADE IN ACCORDANCE WITH INSTRUCTIONS STATED ON EACH INVOICE ISSUED BY LESSOR. ALL CHARGES INVOICED BY LESSOR ARE DUE AND PAYABLE WITHIN THIRTY (30) DAYS FROM THE DATE OF EACH INVOICE. IF LESSOR'S INVOICE IS NOT PAID WHEN DUE, LESSOR MAY CHARGE, AS ADDITIONAL RENTAL, A SERVICE CHARGE AT THE RATE OF 1.5% PER MONTH (18% PER ANNUM) ON THE UNPAID BALANCE."

In 2003, Pacific declared some containers lost. Pacific and Textainer negotiated a discounted replacement value and Textainer agreed to forego rental charges following the declared loss. Textainer told Pacific it was getting special treatment, that freezing rental charges was an "abnormal practise," and that other customers facing similar losses were not getting so favorable a deal.

2

Four years later, in 2007, the events giving rise to the present dispute unfolded. On September 13, 2007, Pacific informed Textainer it had lost 131 containers. On July 19, 2008, Pacific informed Textainer of another 141 lost containers. Pacific did not pay the containers' replacement values. Nor did Textainer invoice Pacific for them. Instead, Pacific attempted to negotiate a reduced replacement value. Textainer resisted, saying it could not repeat the accommodations made in 2003.

Meanwhile, Textainer continued to invoice Pacific for monthly rental charges for the lost containers, and Pacific paid rent through the July 2009 invoice. Pacific paid this rent despite wanting, and telling Textainer it wanted, a freeze in rental charges while the replacement value negotiations played out. Textainer replied to Pacific that rental charges per container "w[ould] only be terminated as and when we receive the full replacement value." In one instance, Textainer stated, in an internal e-mail, it had told Pacific "termination of [rental charges] will be as per the invoice date." If Pacific was told this, there is no evidence Pacific ever requested an invoice at the time.

In January 2010, Textainer accused Pacific of breach of the lease agreement based on its failure to pay rent after July 2009. After some back and forth, Textainer sent, in March 2010, an invoice for all then-lost containers in the amount of $443,656.87, a number accurately reflecting the replacement value without any discount.

Having not been paid, Textainer sued Pacific for breach of contract on April 22, 2010. Textainer alleged breach based on Pacific's failure to pay rent and failure to pay the replacement value of the lost containers.

In May 2010, a month after Textainer's lawsuit, Pacific remitted $310,416.17[1] to Textainer, which the parties agree is the lost containers' replacement value minus the rent paid on those containers since the September 2007 and July 2008 statements of loss—

---

[1] The amount may also have been $310,394.17 according to one bank record, but the difference is not relevant to this appeal.

3

rent Pacific claims it did not owe because, according to Pacific, the statements of loss stopped rent from accruing. The remittance did not end the dispute.

After a bench trial on April 18, 2011 and May 2, 2011, the trial court issued a statement of decision on July 6, 2011. It found the language of the lease agreement answered the questions before it. It ruled Textainer had no obligation to invoice Pacific for the replacement value of the lost containers, and thus rent did not stop accruing on them while the replacement value went unpaid. It awarded Textainer $79,519.05 in unpaid rent, $133,262.73 for the remaining unpaid replacement value (necessitated by Pacific's deduction from the May 2010 remittance), various service charges and relocation costs, and attorney fees and costs, to be determined later. Judgment for Textainer was entered on July 6, 2011, in the amount of $261,455.50. An amended judgment entered on July 26, 2011, added an award of $59,316.91 for attorney fees and costs.

Pacific filed a timely notice of appeal from the July 6, 2011, judgment on September 6, 2011.

### DISCUSSION

This appeal presents a question of contract interpretation. Where, as here, the parties do not dispute the relevant facts and do not make arguments regarding the "credibility of conflicting extrinsic evidence," contract interpretation is "a question of law for de novo review by the appellate court." (*Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57.)

Textainer asserts, and the trial court concluded, Pacific owes daily rental charges on each lost container through the date Pacific paid the replacement value for that container. Textainer relies on paragraphs 1 and 10 of the 2001 agreement. Looking solely at these paragraphs, when a container is lost, Pacific indeed must keep paying daily rent charges as Textainer asserts. When Pacific pays the replacement value, the container is finally "off-hired" and rent charges no longer accrue.

4

Pacific claims, however, paragraphs 1 and 10 must be read in connection with paragraph 6.  (See *Zubia v. Farmers Ins. Exchange* (1993) 14 Cal.App.4th 790, 797 [" 'language in a contract must be construed in the context of that instrument as a whole' "].)  Paragraph 6 states Textainer "will charge" Pacific for a lost container's replacement value once Pacific "become[s] responsible" for it.  Under Pacific's reading of paragraph 6, Textainer must invoice Pacific for a lost container's replacement value within a reasonable period of time.  If Textainer fails to do so, it is effectively thwarting Pacific's contractual right to freeze rent by paying the replacement value.  (See *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 363 [" ' "[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." [Citations.]' [Citations.]"].)  Pacific reads too much into paragraph 6.

Paragraph 6 does state Textainer "will charge" Pacific for lost containers once Pacific "become[s] responsible" for them, but it does not prohibit Pacific from making payments in advance of invoice or render such payments impossible.  Nor does it require Textainer to issue an invoice before its right to payment accrues.  Rather, the stated purpose of the invoice requirement is to start a 30-day period after which accrued payments become "due" and Textainer may levy late charges of 1.5 percent per month on overdue balances.

Such a reading is consistent with how courts view contractual promises to issue invoices.  Thus, even if paragraph 6 contained a promise to not only invoice, but to invoice promptly in the manner Pacific claims, courts view such promises as ministerial or de minimus.  And indeed, Pacific has cited no case enforcing an invoicing promise in the manner it proposes.

Thus, in *Vowels v. Witt* (1957) 149 Cal.App.2d 257, 262, a contractor rendering services was required to " 'bill . . . for all costs incurred during the preceding calendar month,' " rendering these amounts " 'immediately due and payable.' "  The appellate

5

court held the contractor could collect on late bills, because late billing did not mean "the contractor did not substantially perform the contract." (*Ibid.*; accord, *Gastronomical Workers Union Local 610 v. Posadas de Puerto Rico Associates, Inc.* (D.P.R. 2008) 544 F.Supp.2d 89, 95 [defendant "may not rely on the Funds' alleged failure to send timely invoices for its refusal to pay inasmuch as defendant's obligation to make these contributions stems from the [agreement at issue]."]; *Chas. T. Main, Inc. v. Massachusetts Turnpike Authority* (1964) 347 Mass. 154 (*Main*).)

Although not from California, we find the *Main* case, from Massachusetts's highest court, instructive. It concerned a contract between an engineering firm and the Massachusetts Turnpike Authority. The authority promised to make the final payment for the firm's services " '[u]pon the completion and acceptance by the [a]uthority of all construction work required by all of the construction contracts and the final determination of the cost of construction." (*Main*, *supra*, 347 Mass. at pp. 155–157, fn 4. ) A formal final determination of cost was not made until 1960, but both parties were clearly aware of the costs due to the firm, over $170,000, as of 1958. (*Id.* at pp. 165, 167.) The firm demanded interest on the balance for the period between 1958 and 1960, but the authority rejected this claim, asserting the balance was not due until the issuance of the final cost determination. (*Id.* at p. 159.) The Supreme Judicial Court of Massachusetts held as of 1958, "the authority had no further justification for withholding" pay, the firm "was entitled to payment," and entitled, furthermore, to interest. (*Id.* at p. 168.)

Analogizing to the present case, Pacific knew, from the 2006 schedules, what it owed in replacement costs. Textainer's failure to invoice did not change the fact that Pacific, under the lease, had to pay replacement costs (the balance due in *Main*) and had to pay for the lost use of the containers by way of continuing daily rental charges (the interest in *Main*).

In closing, we note the "pay rent until replacement value paid" method of handling lost rental goods is not unique to the present case. (See, e.g., *In re Muma Services Inc.*

6

(Bankr. D.Del. 2002) 279 B.R. 478, 488 ["NPR may elect to continue to pay rent on the lost unit or may elect to pay the replacement value of the unit which would stop the rent obligation"].) In fact, it is quite common to measure restitution damages for lost rental items as the sum of replacement value and loss of rent that could have been earned. (*People v. Thygesen* (1999) 69 Cal.App.4th 988, 996 ["Any award . . . shall be based on the reasonable replacement value of a cement mixer of like style and age, as well as loss of rental value from the date of loss to the date the mixer should have reasonably been replaced."]; *Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 818 [differentiating between loss of property and loss of use of that property]; accord, *Walton Commercial Enterprises, Inc. v. Associations, Conventions, Tradeshows, Inc.* (Ohio Ct. App. 1990) 593 N.E.2d 64, 67 ["until the chattel is retaken by the lessor, the lessee's obligation to pay rent continues" and since in that case "the equipment could not ever be returned, appellee's duty to pay rent continued until appellee's tender of the monetary value of the equipment"].)

In sum, Pacific was properly bound by the plain and express terms of its agreement with Textainer.

**DISPOSITION**

The judgment is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

7